(26 App. Div. 434.)

### QUIGLEY v. H. W. JOHNS MFG. CO. et al.

(Supreme Court, Appellate Division, Second Department.    March 8, 1898.)

1. NEGLIGENCE OF CO-TENANT.

Where an owner lets different parts of the same building to different tenants, each tenant is under an obligation to the others to exercise reasonable care not to alter the condition of that part of the premises which he occupies so as to injure other tenants in the same building, and a failure in this respect constitutes actionable negligence.

2. MUNICIPAL CORPORATIONS—REPAIRS—OFFICIAL PERMIT.

Laws 1894, c. 481, § 32, requiring an official permit for the prosecution of certain work in the city of Brooklyn, did not operate to render unlawful the making, without such permit, of mere alterations in existing buildings, such as the removal of a floor.

3. NEGLIGENCE OF LANDLORD—DEGREE OF CARE.

In an action to recover damages for injuries causing the death of plaintiff's intestate, it appeared that he occupied, as a tenant of the P. Co., one of the defendants, a portion of a building of which the H. W. J. Co. had formerly occupied, as tenants, an upper story, where they had made certain alterations which were alleged to have occasioned the collapse of the building, and thus resulted in the death of plaintiff's intestate. *Held*, that the duty of the owner was to exercise the reasonable care of a prudent landlord on regaining possession of the upper story, not to suffer the continuance of any condition there created by the former tenant, which he knew occasioned, or had reasonable cause to believe would occasion, danger to plaintiff's intestate.

4. SAME—CONTRIBUTORY NEGLIGENCE OF TENANT.

Upon the question of whether the tenant of a portion of a building who was killed by its collapse, due to defects in other portions which were under the landlord's control, was guilty of contributory negligence, *held*, that the reasonable care of a prudent landlord may well require a higher degree of actual diligence and circumspection than the reasonable care of a prudent tenant.

5. EXPERT EVIDENCE.

A competent expert witness, speaking upon a question of science relating to the construction of buildings and the mechanical action of external forces upon an edifice constructed in a particular manner, may properly be asked, in presence of the given fact that the building collapsed, of what causes that collapse was the result.

Appeal from trial term, Kings county.

Action by Thomas F. Quigley, as administrator, against the H. W. Johns Manufacturing Company and the Phenix Chemical Works. From a judgment on the verdict of a jury for $4,000, and from an order denying a new trial, defendants appeal.    Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, and HATCH, JJ.

William A. Jenner, for appellant H. W. Johns Mfg. Co.
George W. Wingate, for appellant Phenix Chemical Works.
Charles J. Patterson, for respondent.

WILLARD BARTLETT, J.    On the morning of the 6th day of February, 1896, a brick building belonging to the Phenix Chemical Works, and situated on Thirty-Ninth street, near Second avenue, in the city of Brooklyn, was blown down in a violent storm, and collapsed, causing the death of James Quigley, a cooper, who was a tenant of the ground floor.    This action was brought by his administrator to recover damages for wrongfully causing his death

against the Phenix Chemical Works, from which he rented the lower portion of the building; and also against the H. W. Johns Manufacturing Company, which had been a tenant of the upper part of the structure, and had made a series of cuttings or holes in the wall of the building, to the weakening effect of which its collapse was attributed. The plaintiff has recovered a verdict of $4,000 against both defendants, and both defendants have appealed.

The case presents some interesting questions of law, and it will be necessary for us to consider (1) the alleged negligence of the H. W. Johns Manufacturing Company, the tenant creating the condition which is said to have caused the accident, but whose tenancy had ceased before the accident occurred; (2) the alleged negligence of the Phenix Chemical Works, the landlord of the plaintiff's intestate, by whose action or nonaction the condition created by the H. W. Johns Manufacturing Company was allowed to continue after the termination of the tenancy of that corporation; and (3) the alleged contributory negligence of James Quigley, the tenant who was killed. The building was a brick structure, between 130 and 140 feet in length, 30 feet wide, and between 35 and 40 feet high from the ground to the peak of the roof. It was constructed in 1877 by the Phenix Chemical Works for the manufacture of sulphuric acid. The walls were 16 inches thick to the top of the first floor. Above that to the roof the thickness of the walls was 12 inches; but this upper portion of the wall was strengthened by a series of pilasters 16 inches thick (that is to say, 4 inches thicker than the wall), which pilasters were 13 feet apart. As these pilasters were 2 feet wide, the side walls of the building may correctly be described as 16 inches thick for one-third of their height, and 12 inches thick for the remainder, except for the 2 feet occupied by each pilaster, where the thickness was 16 inches. Each pilaster was so built as to constitute a part of the wall itself. In 1891 the Phenix Chemical Works ceased to do business there, and took out a lead chamber which occupied the upper portion, leaving the building divided into two parts by a floor which constituted the ceiling of the basement. In January, 1894, the plaintiff's intestate, James Quigley, hired the building from the Phenix Chemical Works for use as a cooperage, at a rent of $15 a month. His principal customer was the H. W. Johns Manufacturing Company, and in October, 1894, with his sanction, the Phenix Chemical Works rented to the H. W. Johns Manufacturing Company all of the building except the ground floor, at the rate of $15 a month. In the correspondence which constituted the contract it was stipulated that, inasmuch as the H. W. Johns Manufacturing Company would have to put in various ceilings, fittings, partitions, double windows, etc., entirely at its own expense, it was understood that whatever it put into the building was its own property, and could be removed when the premises were vacated. The Johns Company went into possession under this contract of letting, and put up a second floor between the first floor and the roof. For this purpose it caused holes 4 inches deep to be cut in the pilasters to receive the ends of the beams or girders which were to support the floor. There were about 21 of these holes in

all, and the size of each girder was 6 by 10 inches. The Johns Company continued to occupy the upper part of the building, and use this floor, after its construction was completed, until the autumn of 1895, when its tenancy terminated, and it removed the floor, including the beams or girders, the ends of which had been inserted in the series of holes already mentioned. These holes were left unfilled, and remained so up to the time when the building fell. No consent of the Brooklyn department of buildings to the alteration of the building by the removal of the beams or girders was ever obtained by the Phenix Chemical Works or the Johns Company. It does not appear that any officer or representative of the Phenix Chemical Works had actual knowledge that the cuttings had been made in the pilasters for the introduction of the beams, or that the holes had been left unfilled upon the removal of the girders, until after the Johns Company had moved out of the building. Subsequently to the removal, however, and in the early part of December, 1895, Mr. Edward M. Gridley, the secretary of the Phenix Chemical Works, visited the building, and went upstairs with Quigley, who called his attention to the holes in the wall, and said that he did not think the Phenix Chemical Works had left the wall looking very nice. Mr. Gridley told him he thought they had left the building in better condition, take it altogether, than when they found it; and nothing further was said between them on the subject. There is other evidence in the case that Quigley was present at the time of the removal of the beams, and the fair inference is that he must have been well aware of the fact that the holes had been left unfilled. Although the evidence did not fix the precise moment at which the building fell, counsel agreed that it was about 9:25 or 9:26 a. m. A violent storm of wind and rain prevailed in the vicinity at the time. The records of the United States weather bureau in the city of New York showed that between 9:20 and 9:25 o'clock that morning the wind blew from the east at a velocity of 52 miles an hour, and that the extreme velocity for one minute was 58 miles. The evidence of the local forecast official in charge of that bureau tended to show that similar conditions probably prevailed in that part of Brooklyn where this building stood. He said that a storm with wind of 58 miles an hour was not a common occurrence in this locality, although such storms occurred every winter, and there are half a dozen storms every winter running from 50 to 60 miles an hour, with gusty conditions accompanying them. In November, 1895, there were two storms of 50 miles an hour, and in December, 1895, the wind on two occasions attained a velocity of 80 miles an hour. These storms in November and December the building proved strong enough to resist. It was the contention of the plaintiff, however, that the side wall on the east had been so weakened by the row of holes left in the pilasters that it was not strong enough to withstand the force of the wind which struck it in the storm on the morning of February 6, 1896; that the entire building fell in consequence of the weakness of this wall, thus causing the death of Quigley, who was engaged in his work there at the time; that the Johns Company was liable for his death, because it

had wrongfully created the condition which caused the wall to fall; and that the Phenix Chemical Works were also liable, because that corporation, being the landlord in control and possession of the upper part of the building, where the holes were, had allowed them to remain unfilled.

From this statement of the facts it will be seen that the tenancy of the Johns Company ceased many weeks before the building fell. The theory upon which the learned counsel for the plaintiff would hold that corporation is that by its act in cutting the holes it created an intrinsically dangerous nuisance, imminently perilous to the lives of the other persons in the occupation of the building; and he cites those cases in which the creator of such a condition has been made to respond for injuries resulting therefrom, even after his control over that condition has ceased. Thomas v. Winchester, 6 N. Y. 397; Coughtry v. Woolen Co., 56 N. Y. 124; Devlin v. Smith, 89 N. Y. 470. But no such state of things existed here as was represented in those cases. There is an obvious danger, in labeling a deadly poison as a harmless medicine, to every person who may have occasion to use the poisonous drug thus labeled. So it is plain that the defective construction of a scaffold intended for the use of workingmen upon a lofty building will be likely to imperil the lives of those who are called upon to make use of it. In this case, however, the cutting of the comparatively small holes in the pilasters, still leaving the pier, at its thinnest point, just as thick as the neighboring wall, cannot fairly be regarded as the creation of a condition of imminent danger which was at all obvious or readily apparent to any one. Indeed, it may fairly be inferred that if the representatives of the Johns Company, at the time they left the holes in the building, had taken the expert advice of some of the very highly qualified witnesses who testified upon this trial, they would have been assured that the holes constituted no source of danger whatever. So far as the Johns Company is concerned, the true ground of liability would seem to be an entirely different doctrine of law. Where the owner lets different parts of the same building to different tenants, each tenant has the right as against every other that such other tenant shall not injure him by any active interference with the part which such other tenant occupies. Thus it is plain that the tenant of the second story has a right that the first story shall remain intact so far as may be necessary for the support of the premises demised to him, and also that the roof on the story above shall not be interfered with so as to permit his premises to be injured by the action of the elements. This right is in the nature of an easement. See Washb. Easem. (4th Ed.) pp. 639–647; Pierce v. Dyer, 109 Mass. 374. Out of this easement springs the obligation on the part of one tenant to exercise reasonable care not to alter the condition of that part of the premises which he occupies so as to injure other tenants in the same building. A failure in this respect constitutes actionable negligence. Eakin v. Brown, 1 E. D. Smith, 36, 44. Upon this doctrine the cause of action here asserted against the Johns Company is not for a violation of the easement, which would have accrued at the

time the beams were removed from the holes and the holes were left unfilled, but rests upon the violation of the obligation arising out of the easement, which violation occasioned the death of the plaintiff's intestate. In this view, the cause of action, being for negligence, did not accrue until the killing of Quigley by the fall of the building.

It remains to inquire, in reference to this defendant, whether the trial judge was right in charging the jury that it was an unlawful thing to remove the floor from the building in November, 1895, without the consent of the building department of the city of Brooklyn. This instruction was given at the request of the plaintiff, the judge saying that he had not seen the building law, but that he assumed the proposition to be correct, and therefore charged it. It is sought to be sustained by reference to section 32 of chapter 481 of the Laws of 1894. But I do not think that the language of that section supports the proposition. The statute does provide that, before "the erection, construction, or alteration of any building or part of any building" is commenced in the city of Brooklyn, the owner or his agent or architect shall submit to the commissioner of buildings a detailed statement in writing of the specifications, and a full and complete copy of the plans of the proposed work. The only prohibition, however, in the section cited, against the commencement or continuance of work without the approval of the commissioner of buildings and the issuance by him of a permit is contained in the following sentence, which does not embrace alterations: "Such statement and copy of the plans shall be kept on file in the office of the commissioner of buildings, and the erection, construction or any part thereof shall not be commenced or proceeded with until said statements and plans have been so filed and approved by the commissioner of buildings and a permit issued by him therefor." The probability is that the word "alteration" was omitted by accident or inadvertence from this portion of the statute, but I think it quite clear that the section as it stands did not make it unlawful for the Johns Company to remove the floor without the consent of the building department. If so, the instruction to the jury on this subject was erroneous.

As to the liability of the Phenix Chemical Works, the responsibility of that corporation for the accident, if it is responsible at all, must arise out of its relation as landlord to Quigley as tenant. At the time of the accident by which Quigley lost his life the upper portion of the building in which the holes had been cut had been restored to the Phenix Chemical Works, and was wholly within the custody of that company as landlord. The rule, therefore, would seem to apply which was laid down by Van Brunt, J., in Bold v. O'Brien, 12 Daly, 160, in this language:

"The landlord, as far as the tenant is concerned, where the tenant occupies but a small portion of the tenement, is bound to keep the parts of the tenement under his control in such a state of repair that the tenant may occupy his premises with safety."

The rule has frequently been asserted in the law of landlord and tenant that a landlord who occupies the upper story of his build-

ing, leasing the lower story to a tenant, may not negligently derange the construction of the upper story so as to injure the property of the tenant on the floor below. Glickauf v. Maurer, 75 Ill. 289. In Priest v. Nichols, 116 Mass. 401, the plaintiffs were tenants on the lower floor of a building belonging to the defendants, who themselves occupied the floor above. It was alleged that the defendants had charge of a waste pipe leading through the lower floor, and negligently permitted it to get out of repair so that the water damaged the plaintiffs. The court held that these questions were properly left to the jury, and sustained the verdict for the plaintiffs, saying:

"The rule that a landlord is not bound to keep the premises of his tenant in repair, and therefore cannot be held responsible for negligence if out of repair, has no application to the facts presented in this case."

In Toole v. Beckett, 67 Me. 544, the plaintiff hired a store from the defendant, who retained possession, care, and control of the upper part of the building. The tenant's goods in the store were injured by rain which came down between the roof and the chimney, and the landlord was held liable for negligence in the manner of maintaining the roof. Under such circumstances it was held that the landlord undertakes so to exercise his control of that portion of the premises remaining in his possession as to inflict no injury upon his tenants. Applying the doctrine of these decisions to the case at bar, there is no difficulty in holding that the Phenix Chemical Works owed to Quigley some degree of diligence in respect to the condition of the upper part of the building. Their obligation, as it seems to me, was to exercise the reasonable care of a prudent landlord, on regaining possession of the upper part of the building, not to suffer the continuance of any condition there created by the former tenant which they knew occasioned, or had reasonable cause to believe would occasion, danger to Quigley. If they fulfilled this obligation, they should be exonerated. If they failed to fulfill it, then they should be held liable, unless relieved by the contributory negligence of Quigley himself.

This brings us to the third important question in the case. It is argued with great earnestness that it is illogical to condemn the Phenix Chemical Works for failing to discover that the holes in the wall were dangerous, and at the same time to acquit Quigley. Indeed, in the view taken by the trial judge, I do not see how a verdict for the plaintiff could very well be upheld; for by the twenty-sixth and twenty-seventh instructions given at the request of the Phenix Chemical Works, the jury were told that the standard by which they were to ascertain whether there was any negligence either on the part of Quigley or the Phenix corporation was what was apparent to a reasonable man upon ordinary inspection; thus assuming that only the same measure of diligence applied to the landlord as applied to the tenant. I am inclined to think that this assumption is incorrect. The reasonable care of a prudent landlord may well require a higher degree of actual diligence and circumspection than the reasonable care of a prudent tenant. Where the landlord makes or tolerates a change in the construction of that portion of the premises which remains under his control, I think

he is bound to take precautions against endangering the life, limb, or property of the remaining tenant. Precisely what prudence requires that he should do to this end may vary according to the circumstances of the case; and a jury might well find that he ought not to remove a permanent portion of the structure, or allow the same to be removed, without some advice or inquiry of persons skilled in building construction as to the effect of such removal on the stability of the edifice. A prudent tenant, on the other hand, occupying another part of the building, whose only information of the change was derived from ordinary observation, and who possessed no special knowledge of building, might be exonerated from any imputation of negligence on his part for not discerning or appreciating the danger or extent of the danger involved in the changed construction. It seems to me entirely possible, therefore, for a jury to take a view of the evidence in this case which would render the landlord liable, and would relieve the tenant, who lost his life, from any charge of contributory negligence. In saying this I do not mean that a jury ought to take that view, for the evidence is also quite capable of a view which would wholly exonerate both defendants. But that there was a question of fact to be determined by a jury as against the Phenix Chemical Works as well as against the H. W. Johns Manufacturing Company appears to be entirely clear.

There must be a new trial, however, not only by reason of the error already pointed out in charging the jury that the removal of the floor without the consent of the building department of the city of Brooklyn was unlawful, but also by reason of the exclusion of certain evidence which was offered in the course of the examination of Mr. George M. Olcott, the president of the Phenix Chemical Works, who was an expert witness in regard to building construction, and who superintended the erection of the building which collapsed. It was the evident purpose of counsel for the defendants to prove by this witness, among other things, that the line of holes had nothing to do with the break in the wall, and that the fall of the building was due to some other cause. To this end he was asked the following question: "Now, in view of the fact that the wall fell along the line of the break, as you have testified, and that this line of the break was a considerable distance below the line of the holes, what, in your opinion, had the holes to do with the break?" Objection was made, but before any ruling the witness answered, "Nothing." The record then goes on to say:

"Mr. Patterson: That is an expert question. Mr. Wingate: I think the witness has qualified himself as an expert. The Court: I think that is something about which the jury can tell just as well as the witness. I think that is the very question for the jury. (Objection sustained. Both defendants except.)"

The learned counsel argues that this question was actually answered, and the answer was not stricken out; and perhaps that is enough to avoid the exception, although the jury, if of the average intelligence, must have understood the ruling as excluding from their consideration the answer which had just been given. But the same argument will not apply to the exceptions taken to the exclusion of the next two questions, which the trial judge refused to

allow on the ground that they were solely for the jury. The first of these questions was: "Q. Now state what, in your opinion, was the cause of the falling of that building." The second was: "Q. Well, how, in your opinion, did the force of the storm affect the building so as to cause it to fall,—in what way?" The testimony which these questions sought to elicit was admissible, notwithstanding the fact that it called for an opinion upon the question, or one of the questions, which the jury were to determine. Moyer v. Railroad Co., 98 N. Y. 645; Van Wycklen v. City of Brooklyn, 118 N. Y. 424, 24 N. E. 179; Covert v. City of Brooklyn, 6 App. Div. 73, 39 N. Y. Supp. 744. There was no suggestion that Mr. Olcott was not a thoroughly competent expert; and in the case first cited the court said:

"The witness, as an expert, and speaking upon a question of science, might very well be asked, in presence of a given effect, of what causes it either was, or might be, the resultant."

The subject under consideration relating to the construction of buildings, and the mechanical action of external forces upon an edifice constructed in the particular manner, called for the application of scientific or skilled knowledge within the meaning of the rule laid down by Mr. Justice Bradley in Schwander v. Birge, 46 Hun, 66, 70, where he declared that, to warrant the admission of opinion evidence, "the subject must be one of science or skill, or one of which observation and experience have given the opportunity and means of knowledge, which exist in reasons rather than descriptive facts, and therefore cannot be intelligently communicated to others not familiar with the subject, so as to possess them with a full understanding of it." And in that case the same learned judge upheld the exclusion of the opinion evidence offered on the trial, upon the express ground that the inquiry "involved no question of architecture as such, no combination of forces or strength of structural support requiring scientific or mechanical deduction." Here, on the other hand, the inquiry with which the jury were most concerned did involve precisely such questions, and the exclusion of the opinion evidence was clearly erroneous.

The judgment should be reversed, and new trial granted as to both defendants. All concur.